HILL, Senior Circuit Judge:
Plaintiffs brought this action challenging the facial constitutionality of Alabama’s statute permitting non-sectarian, non-proselytizing student-initiated prayer, invocations and benedictions during compulsory or non-eompulsory school-related assemblies, sporting events, graduation ceremonies and other school-related events. Plaintiffs also challenged the statute as applied by the DeKalb County School Board., The district court held the statute unconstitutional on its face, granted plaintiffs partial summary judgment on their claims regarding the statute as applied, and enjoined defendants from enforcing the statute or continuing to conduct the challenged practices. Defendants bring this appeal.
I.
In 1993, the Alabama Legislature enacted a statute containing the following provision:
(b) On public school, other public, or other property, non-sectarian, non-proselytizing student-initiated voluntary prayer, invocation and/or benedictions, shall be permitted during compulsory or non-compulsory school-related student assemblies, school-related student sporting events, school-related graduation or commencement ceremonies, and other school-related student events.
Ala.Code § 16-l-20.3(b) (1995).
In 1996, Michael Chandler, a vice-principal in the DeKalb County school system, and his son Jesse, a student in that system, brought this action challenging the facial validity and the application of this statute in the DeKalb County schools.[1] Defendants included the Governor of the State of Alabama, the State Superintendent of Education, the members of the State Board of Education, and the Superintendents and members of the boards of education of the City of Talladega and of DeKalb County, Alabama.[2]
On March 12, 1997, the district court granted partial summary judgment for the Chandlers, holding the statute facially unconstitutional. On October 29, 1997, the district court permanently enjoined De-Kalb County from enforcing the statute. On November 12, 1997, the district court issued findings of fact and conclusions of law in its Supplemental Opinion and Order. That same day, but by separate Memorandum Opinion and Order, the district court held that DeKalb had engaged in unconstitutional officially organized or sponsored religious activities, and granted summary judgment to the Chandlers on their claim that DeKalb had applied the statute unconstitutionally. The district court appointed a monitor to oversee the *1257 enforcement of the Permanent Injunction. All defendants appealed from the Permanent Injunction, the Supplemental Opinion and Order, and the Memorandum Opinion and Order.
In his brief, the Governor of the State of Alabama asserts that the district court erred in holding the statute facially unconstitutional under the First Amendment. The Governor contends that the First Amendment’s prohibition against the establishment of a religion does not apply to the states by virtue of the Fourteenth Amendment. The district court rejected this argument, as do we. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). See also Everson v. Board of Educ., 330 U.S. 1, 8, 67 S.Ct. 604, 91 L.Ed. 711 (1947). Because the states are bound by the First Amendment, the district court did not err in evaluating Alabama’s statute under it. Accordingly, we shall affirm the judgment of the district court as to the Governor’s appeal.[3]
The remainder of the appellants (referred to collectively as DeKalb) do not contest the district court’s holding that the statute is facially unconstitutional, nor that the DeKalb County schools engaged in unconstitutional officially organized or sponsored religious activities. Therefore, we do not review the district court’s determinations of these issues.
Neither does DeKalb appeal that portion of the Permanent Injunction entered by the district court which prohibits it from “aiding, abetting, commanding, counseling, inducing, ordering, or procuring ... school organized or officially sanctioned religious activity in its schools including, but not limited to, vocal prayer, Bible and devotional or scriptural readings, distribution of religious materials, texts, or announcements, and discussions of a devotional or inspirational nature, in school or at school-related events, to include assemblies, sporting events, and graduation ceremonies.” Apparently, DeKalb concedes that, under Supreme Court precedent, it may not prescribe prayer or allow state employees to lead, participate in or otherwise endorse prayer of any type during curricular or extracurricular events.[4] See Lee v. Weisman, 505 U.S. 577, 586, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); County of Allegheny v. ACLU, 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402 (5th Cir.1995).
The Permanent Injunction, however, also prohibits DeKalb from “permitting” vocal prayer or other devotional speech in its schools. While the injunction makes clear that it does not prohibit students from voluntarily praying while at school or at school-related events, either individually or with each other, so long as the prayer is purely private,[5] it prohibits all prayer or other devotional speech in situations which are not purely private, such as aloud in the classroom, over the public address system, or as part of the program at school-related assemblies and sporting events, or at a graduation ceremony. Furthermore, the prohibition applies to bar not only school personnel from leading or participating in such public or vocal prayer or other devotional speech or Bible reading, but also requires school officials to forbid students[6] or other private individuals from doing so lohile in school or at school-related events.
*1258 DeKalb does appeal this portion of the Permanent Injunction. It contends that the district court may not constitutionally require it to forbid this speech, pointing out that the Supreme Court has made very clear that “[p]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression.” Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).[7] “There is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.” Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (quoting Edwards v. Aguillard, 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)) (emphasis in original).
Even the Chandlers agree that “[t]he Establishment Clause does not ban prayer. It bans state prayer.” (Plaintiffs’ Reply Brief) (emphasis in original). They contend, however, that student-initiated religious speech in the public schools is state prayer, and, therefore, DeKalb may not permit it.
Our review of the Permanent Injunction, then, is limited to the issue of whether the district court may constitutionally enjoin DeKalb from permitting student-initiated religious speech in its schools.[8] For the following reasons, we hold the court may not. We vacate the Permanent Injunction and remand for further proceedings.
II.
The district court’s opinion holds that the Constitution requires it to prohibit public religious speech in schools because the Establishment Clause is violated if government permits religious speech-even if initiated by students — in schools or at school-related events. DeKalb contends that this conclusion is wrong for two reasons. First, students are not state actors and, therefore, by definition, their actions cannot tend to “establish” religion in violation of the Establishment Clause. Second, the Free Speech and Free Exercise Clauses of the First Amendment require the State to tolerate genuinely student-initiated religious speech in schools.

Students as State Actors and the Establishment Clause

The Establishment Clause prohibits Congress — or any other governmental body — from acting in such a way as to establish a religion. Everson, 330 U.S. at 8, 67 S.Ct. 504. DeKalb argues that because students are not state actors — Congress or a governmental body — their religious speech cannot, by definition, tend to establish a religion.
It is true that ordinarily religious speech by private parties cannot establish religion, even if it occurs in a public institution, such as a school. Mergens, 496 *1259 U.S. at 250, 110 S.Ct. 2356. On the other hand, it is clear that private parties’ religious speech can violate the Establishment Clause if the State uses such parties as surrogates to accomplish what the State may not do. For example, if a school board may not constitutionally write and require students to recite a prayer, as it most assuredly may not, Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the school board may not avoid this prohibition by delegating this function to others. Lee, 505 U.S. at 577, 112 S.Ct. 2649 (invalidating school board policy permitting clergy to give prayers at graduation); Karen B. v. Treen, 653 F.2d 897 (5th Cir.1981) (invalidating school board guidelines which required student or teacher-led prayers in classrooms). Nor may the State establish a policy which “permits” private parties to speak, but then limits their speech to prayer or other devotional speech. Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 277 (5th Cir.1996) (authorizing invocations, benedictions and prayers); ACLU v. Black Horse Pike Reg’l Bd. of Educ., 84 F.3d 1471 (3d Cir.1996) (school board policy permitted students to vote to have prayer at graduation); Harris v. Joint Sch. Dist., 41 F.3d 447 (9th Cir.1994), vacated as moot, 515 U.S. 1155, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995) (school policy permitted student to lead prayer); Jager v. Douglas County Sch. Dist., 862 F.2d 824 (11th Cir.1989) (authorizing student-led invocations and only invocations at school sporting events); Hall v. Board of Sch. Comm’rs, 656 F.2d 999 (5th Cir.1981) (school policy permitted devotionals, and only devotionals); Collins v. Chandler Unified Sch. Dist., 644 F.2d 759, 760-61 (9th Cir.1981) (authorizing invocations, benedictions, and prayers only).
When the State commands religious speech, it steps over the Constitution to establish religion. In each of these cases, it is the State’s decision to create an exclusively religious medium which violates the Establishment Clause; not the private parties’ religious speech. It is not the “permitting” of religious speech which dooms these policies, but rather the requirement that the speech be religious, i.e., invocations, benedictions, or prayers.
This was the holding of the original school prayer case, Engel v. Vitale, in which the Court observed:
The Petitioners contend among other things that the state laws requiring or permitting use of the Regents’ prayer must be struck down as a violation of the Establishment Clause because that prayer was composed by governmental officials as a part of a governmental program to further religious beliefs. For this reason, petitioners argue, the State’s use of the Regents’ prayer in its public school system breaches the constitutional wall of separation between Church and State. We agree with that contention since we think that the constitutional prohibition against laws respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.
370 U.S. at 425, 82 S.Ct. 1261 (emphasis supplied). The Court held, therefore, that “government in this country, be it state or federal, is without power to prescribe by laiv any particular form of prayer ivhich is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.” Id. (emphasis supplied). This is all it held.
Some lower courts have extended Engel to require government to prohibit any public expression of religious belief in schools. Support for this holding is said to be located in the Court’s observation that the denominational neutrality of the prayer did not “free it from the limitations of the Establishment Clause.” Id. at 430, 82 S.Ct. 1261. These courts interpreted this to mean that no religious speech could be tolerated in the public schools because the Establishment Clause forbade it.
*1260 This is not what the Court said, however. The denominational neutrality of the Regent’s prayer could not “free it from the limitations of the Establishment Clause” because the prayer was “commanded” by the State. It really did not matter what the prayer said; no prayer commanded by the State can survive scrutiny under the Establishment Clause.
The Court specifically cautioned that “nothing could be more wrong” than to interpret Engel to require “a hostility toward religion or toward prayer.” Id. at 434, 82 S.Ct. 1261 (emphasis supplied). On the contrary, “[t]he history of man is inseparable from the history of religion.” The First Amendment, “which tried to put an end to governmental control of religion and of prayer, was not written to destroy either.” Id. at 435, 82 S.Ct. 1261. Rather, it protects freedom of religious expression by forbidding government from requiring us to “speak only the religious thoughts that government want[s][us] to speak and to pray only to the God that government want[s][us] to pray to.” Id. The Court summarized its holding in Engel in the following way:
It is neither sacrilegious nor antireli-gious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance.
Id. (emphasis supplied). Thus, Engel merely made clear that the Establishment Clause prohibits the government from commanding prayer and prescribing its form.[9]
But DeKalb does not claim otherwise. DeKalb contends only that nothing in the First Amendment, nor in any of the Supreme Court’s interpretations of it, requires it to prohibit the religious speech of private parties — such as students — if that speech is genuinely privately-initiated, i.e., not commanded by a school board or state law. On the contrary, DeKalb argues, the First Amendment positively requires that it tolerate students’ religious speech to the same extent that it permits students’ secular speech.
The Chandlers, on the other hand, contend that when the State permits students to speak religiously in situations that are not purely private,[10] the State lends its imprimatur to the speech, thereby endorsing and advancing religion in violation of the “obligation of the public schools to provide a religiously neutral environment.” They also argue that all public religious speech in schools is unconstitutionally coercive of some students because of “peer pressure.” Consequently, schools must forbid all public religious speech in school, including genuinely student-initiated religious speech.

Student Speech and the Free Exercise and Free Speech Clauses

This, then, is the question DeKalb asks us to answer. Do school officials have “the ability (and duty) to impose content restrictions on purportedly ‘private’ speakers at school events,” in order to achieve neutrality with respect to religion as the Chandlers contend (Chandlers’ Brief at 27); or do the Free Exercise and Free Speech Clauses require that school officials permit student religious speech at the same time, and in the same place and manner as secular speech, as DeKalb contends? Under the Chandlers’ theory, student religious speech is attributable to the State thereby violating the constitutional requirement of neutrality. Students, therefore, cannot be permitted to speak freely in school if religion is the topic; the State has a positive duty to censor student speech if it is religious.
*1261 We disagree. The suppression of student-initiated religious speech is neither necessary to, nor does it achieve, constitutional neutrality towards religion. For that reason, the Constitution does not permit its suppression.
It is true that government must be neutral with respect to religion. But it is equally true, as Justice Goldberg warned, that an:
untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and nonin-volvement with the religious which the Constitution commands, but of a brooding and pervasive dedication to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.
School Dist. of Abington Township v. Schempp, 374 U.S. 203, 306, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J. concurring).
The discriminatory suppression of student-initiated religious speech demonstrates not neutrality but hostility toward religion because the:
exclusion of religious ideas, symbols, and voices marginalizes religion.... Silence about a subject conveys a powerful message. When the public sphere is open to ideas and symbols representing nonreligious viewpoints, culture, and ideological commitment, to exclude all those whose basis is “religious” would profoundly distort public culture.
Michael W. McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L.Rev. 115, 189 (Winter 1992).
The prohibition of all religious speech in our public schools implies, therefore, an unconstitutional disapproval of religion. If endorsement is unconstitutional because it “sends a message to nonadherents that they are outsiders,” disapproval is unconstitutional because it “sends the opposite message.” Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O’Connor, J., concurring). ‘What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion.” Id. at 692, 104 S.Ct. 1355 (emphasis supplied). “Cleansing” our public schools of all religious expression, however, inevitably results in the “establishment” of disbelief — atheism—as the State’s religion. Since the Constitution requires neutrality, it cannot be the case that government may prefer disbelief over religion.[11]
Permitting students to speak religiously signifies neither state approval nor disapproval of that speech. The speech is not the State’s — either by attribution or by adoption. The permission signifies no more than that the State acknowledges its constitutional duty to tolerate religious expression. Only in this way is true neutrality achieved.
 Because genuinely student-initiated religious speech is private speech endorsing religion, it is fully protected by both the Free Exercise and the Free Speech Clauses of the Constitution. See Mergens, 496 U.S. at 250, 110 S.Ct. 2356; Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963 (5th Cir.1992). “Students do not shed their constitutional rights ... at the schoolhouse gate.” Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Religious speech by students does not become forbidden “state action” the *1262 moment the students walk through the schoolhouse door.
Furthermore, the Supreme Court has made clear that permitting religious speech or symbols in our public institutions does not automatically constitute an unconstitutional State endorsement of religion. In fact, “[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789.” Lynch v. Donnelly, 465 U.S. 668, 674, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). References to our religious heritage are found in the statutorily prescribed national motto on our currency, “In God We Trust,” 36 U.S.C. § 186, and in the language “one nation under God,” which is part of the Pledge of Allegiance to our flag — recited by public school children every day. Congress opens with a prayer, and, indeed, the Supreme Court, itself, hears oral argument in a chamber decorated with a depiction of Moses and the Ten Commandments. We celebrate Thanksgiving and Christmas as national holidays, and Congress has directed the President to proclaim a National Day of Prayer each year “on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals.” 36 U.S.C. § 169h.
The Constitution does not require a complete separation of church gnd state such that religious expression may not be tolerated in our public -institutions.[12] In fact, “it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.” Lynch, 465 U.S. at 673, 104 S.Ct. 1355 (emphasis supplied). The Supreme Court has made clear that “[a]nything less would require the ‘callous indifference’ we have said was never intended by the Establishment Clause,” and “would bring us into ‘war with our national traditions as embodied in the First Amendment’s guaranty of the free exercise of religion.’ ” Id. (quoting McCollum v. Board of Education, 333 U.S. 203, 211-12, 68 S.Ct. 461, 92 L.Ed. 649 (1948)).
The examples cited above all “evidence [our] accommodation of all faiths and all forms of religious expression, and hostility toward none. Through this accommodation ... governmental action has ‘followed] the best of our traditions’ and ‘respect[ed] the religious nature of our people.’ ” Lynch, 465 U.S. at 677-78, 104 S.Ct. 1355 (quoting Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952)). Genuinely student initiated religious speech can also be accommodated without resulting in an unconstitutional State endorsement of religion.
Furthermore, even if permitting student-initiated religious speech advances religion in some sense, this does not mean the speech violates the Establishment Clause. Even State action may incidentally advance religion without offending the Constitution. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The Supreme Court has recognized that “our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action.” Lynch, 465 U.S. at 683, 104 S.Ct. 1355. “Not every law that' confers an ‘indirect,’ ‘remote,’ or ‘incidental’ benefit upon [religion] is, for that reason alone, constitutionally invalid.” Id. (quoting Committee for Public Educ. & Religious *1263 Liberty v. Nyquist, 413 U.S. 756, 771, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)). Student-initiated religious speech, therefore, even if it incidentally advances religion, does not violate the Establishment Clause because it is private speech endorsing religion which the First Amendment protects. See Clear Creek, 977 F.2d at 965.
Finally, the fact that student religious speech may fall on deaf ears does not make it unconstitutionally coercive. Lee, 505 U.S. at 577, 112 S.Ct. 2649. In Lee, the Supreme Court was careful to point out that:
We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation. We know too that sometimes to endure social isolation or even anger may be the price of conscience or nonconformity.
505 U.S. at 597, 112 S.Ct. 2649.[13] Those who do not espouse a speaker’s religious beliefs are free not to listen, and to express their disagreement by not participating in any way.
Accommodation of religious beliefs we do not share is, however, a part of everyday life in this country:
In so acting, we express respect for, but not endorsement of, the fundamental values of others. We act without expressing a position on the theological merit of those values or of religious belief in general, and no one perceives us to have taken such a position.
Lee, 505 U.S. at 628, 112 S.Ct. 2649 (Souter, J. concurring). Respect for the rights of others to express their beliefs, both political and religious, is the price the Constitution extracts for our own liberty.[14] This is a price we freely pay. It is not coerced.[15] Only when the speech is commanded by the State does it unconstitutionally coerce the listener.[16]
Ultimately, the issue in this case is not whether school officials may prescribe prayer or' enlist surrogates to that end. They may not. Nor is the issue whether school officials may prohibit religious speech in schools, or censor the content of that speech. They may not. The real issue is what sort of time, place, and manner limits may be imposed upon genuinely student-initiated religious speech in schools? When may students pray? Where may they pray? Under what circumstances may they pray?
In answering these questions, we must fulfill the constitutional requirement of permitting students freely to express their *1264 religious beliefs without allowing the machinery of government — the school' — to be used to command prayer. This requires that we resolve the tension between the right to pray and the right to be free from government-mandated prayer. This is not an easy task. It would be easy simply to banish prayer from our public institutions, but this would be not only constitutionally incorrect, but also fundamentally unfair to our society.
III.
How, then, does a school accommodate religious expression without commanding it? DeKalb argues that the answer is simple — it is to be “permitted.” Not required. Not commanded. Not even suggested. Simply, permitted. If students, or other private parties, wish to speak religiously while in school or at school-related events, they may exercise their First Amendment right to do so.
The first principle must always be that genuinely student-initiated religious speech must be permitted. A student’s individual decision to pray or otherwise speak religiously is not the State’s command. Clear Creek, 977 F.2d at 965.[17] Such speech is fully protected. Id. See also Mergens, 496 U.S. at 252, 110 S.Ct. 2356.
On the other hand, even genuinely student-initiated religious speech may constitute state action if the State participates in or supervises the speech. See Duncanville, 70 F.3d at 406-07.[18] Religious speech in school by teachers, for example, is especially troublesome because “a teacher’s [religious] speech can be taken as directly and deliberately representative of the school.” Bishop v. Aronov, 926 F.2d 1066, 1073 (11th Cir.1991). Teacher participation in student-initiated prayer “improperly entangles the State in religion and signals an unconstitutional endorsement of religion.” Duncanville, 70 F.3d at 406. In upholding the Equal Access Act, which provides that schools must afford religious groups the same access to school facilities as secular groups enjoy, the Supreme Court relied in part on the act’s express prohibition on teacher participation which “avoids the problems of the ‘students’ emulation of teachers as role models.’ ” Mergens, 496 U.S. at 251, 110 S.Ct. 2356 (quoting Edwards, 482 U.S. at 584, 107 S.Ct. 2573). Therefore, student religious speech must be without oversight, without supervision,[19] subject only to *1265 the same reasonable time, place, and manner restrictions as all other student speech in school.
Because religious speech is protected speech, government may not censor its content. Lamb’s Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)) (the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses). Suppression of religious speech constitutes viewpoint discrimination, the most egregious form of content-based censorship. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Government may not, therefore, censor religion from the content of students’ protected speech at school. Cornelius, 473 U.S. at 806, 105 S.Ct. 3439 (“Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.”) (emphasis supplied); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (A “state may reserve the [nonpublic] forum for its intended purposes ... as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker’s view.”)
A student’s right to speak religiously is not, however, without limit. The school may impose the same reasonable restrictions on the time, place, and manner of religious speech as it does on secular student speech. Furthermore, a student’s right to express his personal religious beliefs does not extend to using the machinery of the state as a vehicle for converting his audience. See Abington, 374 U.S. at 228, 83 S.Ct. 1560. The Constitution requires that schools permit religious expression, not religious proselytizing. “The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause.” Lee, 505 U.S. at 587, 112 S.Ct. 2649. Proselytizing speech is inherently coercive and, the Constitution prohibits it from the government’s pulpit. Id.
IV.
The Permanent Injunction enjoins DeKalb from “aiding, abetting, commanding, counseling, inducing, ordering, or procuring” school organized or officially sanctioned religious activity. DeKalb does not appeal this prohibition. The record in this case reveals, however, that there were many sincere, but unconstitutional efforts by school personnel to do just what the injunction prohibits — to endorse, encourage, or participate in student religious activity. For this reason, the appointment of a monitor by the district court was not an abuse of discretion. See Local 28 of the Sheet Metal Workers’ Int’l v. EEOC, 478 U.S. 421, 481-82, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). The monitor’s task is to be vigilant in guarding against the repetition of this unconstitutional activity by the schools.
The Permanent Injunction also forbids DeKalb from “permitting” students to speak religiously. This it cannot constitutionally do. So long as school personnel do not participate in or actively supervise student-initiated speech, DeKalb cannot constitutionally prohibit students from speaking religiously and the Permanent Injunction cannot require it to.
We do not undertake to re-write the Permanent Injunction. The district court is in the best position to do that. We note *1266 only that the Permanent Injunction may neither prohibit genuinely student-initiated religious speech, nor apply restrictions on the time, place, and manner of that speech which exceed those placed on students’ secular speech.[20]
Accordingly, the Judgment of the district court is AFFIRMED as to the Governor’s appeal. As to the remaining defendants’ appeals, the Permanent Injunction is VACATED and the case is REMANDED for further proceedings not inconsistent with this opinion.

. Also named as plaintiffs are Jane Doe and her daughter Deborah Doe.

. The Chandlers subsequently entered into a partial consent decree with the City of Tal-ladega and the district court dismissed the Talladega defendants from the case in 1996.

. The Governor does not assert any other error by the district court. We do not decide whether the district court erred in holding the statute facially unconstitutional for any reason not presented to us.

. We do not, therefore, reach any of these issues.

. The Permanent Injunction recites that nothing in it should be read to "affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal Equal Access Act, 20 U.S.C. Section 4071 ef seq., or to quietly engage in religious activity during noninstructional times.” Permanent Injunction at 4.

. We shall refer to all non-government, private parties collectively as "students.”

. The Departments of Justice and Education issued a statement of principles in the summer of 1995 "to provide school officials with guidance [concerning] the extent to which religious expression and activities are permitted in public schools.” The first paragraph of the statement advises:
Student prayer and religious discussion: The Establishment clause of the First Amendment does not prohibit purely private religious speech by students. Students therefore have the same right to engage in individual or group prayer and religious discussion during the school day as they do to engage in other comparable activity. For example, students may read their Bibles or other scriptures, say grace before meals, and pray before tests to the same extent they may engage in comparable non-disruptive activities. Local school authorities possess substantial discretion to impose rules of order and other pedagogical restrictions on student activities, but they may not structure or administer such rules to discriminate against religious activity or speech.
News Release of U.S. Dep't of Educ., Aug. 17, 1995, at 3.

. DeKalb also appeals the district court's decision to appoint a monitor to enforce its injunction which we discuss below.

. The opt-out provision of the school board's policy was constitutionally insignificant in the context of "governmentally composed prayers for religious services” in schools. 370 U.S. at 425, 82 S.Ct. 1261.

. The Permanent Injunction, for example, permits students to "quietly engage in religious activity during noninstructional times, so long as it does not unduly call attention thereto.”

. We believe that the First Amendment's requirement that government "tolerate” diverse political views, including those that are totally antithetical to our constitutionally guaranteed republican form of government, applies to require that government "tolerate” atheistic views without also requiring that we eschew religion. Tolerance of disbelief does not require that we deny our religious heritage, nor elevate atheism over that heritage. The First Amendment requires only that the State tolerate both, while establishing neither. Americans, however, are free to prefer one or the other and to express that preference wherever they are permitted to speak. This means, of course, that a student may choose to express his atheistic views as well as his religious ones.

. In fact, the Constitution probably does not require a "wall'' at all. The phrase comes from a letter written by Jefferson who was neither present when the First Amendment was passed, nor consulted about its language. In a short note to the Danbury Baptist Association written fourteen years after the Bill of Rights was passed, he made a passing reference to idea that the First Amendment "build[s] a wall of separation between church and State.” See Wallace v. Jaffree, 472 U.S. 38, 92, 105 S.Ct. 2479, 86 L.Ed.2d 29 (Rehnquist, J., dissenting). In any event, the "wall'’ concept has been acknowledged by the Court itself, with what Justice Rehnquist characterized as "embarrassing candor,” as merely a "blurred, indistinct, and variable barrier,” which "is not wholly accurate” and can only be "dimly perceived.” Id. at 107, 105 S.Ct. 2479 (quoting Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).

. Of course, in this case we do not have state action. Private religious speech has even less potential for coercion.

. Justice Scalia observed in Lee that "We indeed live in a vulgar age. But surely 'our social conventions,' have not coarsened to the point that anyone who does not stand on his chair and shout obscenities can reasonably be deemed to have assented to everything said in his presence.... I may add, moreover, that maintaining respect for the religious observances of others is a fundamental civic virtue that government (including the public schools) can and should cultivate — so that even if it were the case that the displaying of such respect might be mistaken for taking part in the prayer, I would deny that the dissenter's interest in avoiding even the false appearance of participation constitutionally trumps the government's interest in fostering respect for religion generally.” 505 U.S. at 637-38, 112 S.Ct. 2649 (Scalia, J. dissenting).

. Justice Souter acknowledged this in Lee: “If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State. But that is not our case.” 505 U.S. at 630 n. 8, 112 S.Ct. 2649.

. The "indirect coercion” identified in Lee by the plurality opinion was exerted over the audience by the State's command that there be religious speech at graduation. 505 U.S. at 592-93, 112 S.Ct. 2649. Justice Kennedy's concern that “in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce,” id. at 591-92, 112 S.Ct. 2649 (emphasis supplied), does not apply to the case of student-initiated religious speech.

. The Ninth Circuit also upheld a policy that permitted the top four students to speak on any topic of their choosing without state approval in Doe v. Madison Sch. Dist., 147 F.3d 832 (9th Cir.1998), but the court en banc ordered the district court to dismiss the complaint for lack of standing and mootness. No. 97-35642 (9th Cir. May 19, 1999).

. While many subsequent courts have cited Duncanville for the proposition that student initiated speech at school-related sporting events is un constitutional, the Fifth Circuit specifically held that, "[s]tudents may voluntarily pray together, provided such prayer is not done with school participation or supervision.” 70 F.3d at 405 (emphasis supplied). Judge Jones, in her separate concurrence and dissent, pointed out that:
This decision ... does not prevent students from exercising their constitutional rights of free speech, association and free exercise by praying at appropriate times and in an appropriate manner during athletic practices or games. Further, we must abide by the Supreme Court’s decisions ... that prevent active school leadership, encouragement or promotion of the prayers. The only questions here are how teachers may respond to student-initiated prayers and to what extent the school may "supervise” the prayers.
70 F.3d at 409.

.What constitutes "supervision?” As Judge Jones wrote in Duncanville:
At a broad level, everything that goes on during practice or competition, including student-initiated locker-room or basketball court prayer, is subject to the coaches' "supervision.” To outlaw supervision on this level would be to outlaw the otherwise constitutional student-led prayers.... It must be, then, that the injunction pertains only to active supervision and is thus redundant of the cautions that the school may not promote, encourage or lead prayers.
70 F.3d at 410.
Supervision cannot mean, therefore, mere presence. Support for this view is found in Mergens in which the Supreme Court found *1265 no constitutional infirmity with the provision of the EAA which permits school employees to be present for custodial purposes at religious meetings held on school property. 496 U.S. at 236, 110 S.Ct. 2356. We agree with Judge Jones that, for supervision to amount to unconstitutional endorsement, it must cross the line into active endorsement, encouragement or participation.

. This includes restrictions on announcements permitted in the schools' commencement programs, and the distribution of religious literature.