

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-22-1999

# C.H. v Oliva

Precedential or Non-Precedential:

Docket 98-5061

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"C.H. v Oliva" (1999). *1999 Decisions.* Paper 290.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/290

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 22, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5061

C.H., AS GUARDIAN AD LITEM OF Z.H., A MINOR,
AND C.H., INDIVIDUALLY
Appellant

v.

GRACE OLIVA; GAIL PRATT; PATRICK JOHNSON;
MEDFORD TOWNSHIP BOARD OF EDUCATION;
LEO KLAGHOLTZ, Commissioner of Education;
THE STATE OF NEW JERSEY
DEPARTMENT OF EDUCATION

Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil No. 96-cv-02768)
District Judge: Honorable Joseph H. Rodriguez

Argued June 2, 1999

BEFORE: ROTH and STAPLETON, Circuit Judges, and
LONGOBARDI,* District Judge

(Opinion filed October 22, 1999)

_____

* Honorable Joseph J. Longobardi, Senior United States District Judge
for the District of Delaware, sitting by designation.

F. Michael Daily, Jr.
Quinlan, Dunne & Daily
16 North Centre Street
Merchantville, NJ 08109-2519
 and
Eric W. Treene (Argued)
The Becket Fund for Religious
 Liberty
2000 Pennsylvania Avenue, N.W.
Suite 3200
Washington, DC 20006
 Attorneys for Appellant

Betsy G. Liebman
Capehart & Scatchard
8000 Midlantic Drive
Laurel Corporate Center, Suite 300
Mount Laurel, NJ 08054
 and
Michael P. Madden (Argued)
Madden, Madden & Del Duca
108 Kings Highway East, Suite 200
P.O. Box 210
Haddonfield, NJ 08033
 and
John K. Worthington (Argued)
Office of Attorney General of
 New Jersey
Richard J. Hughes Justice Complex
Trenton, NJ 08625
 Attorneys for Appellees

Marc D. Stern
American Jewish Congress
15 East 84th Street
New York, NY 10028
 Attorney for Amicus-Appellee
 American Jewish Congress

2

OPINION OF THE COURT

STAPLETON, Circuit Judge:

C.H., as guardian ad litem of Z.H. and on her own behalf, appeals from an order of the District Court dismissing her complaint in this civil rights action. She alleges that the defendants, New Jersey public school authorities, impermissibly restricted Z.H.'s freedom of expression while he was a student in kindergarten and first grade. She also contends that the defendants' actions were so hostile toward religion as to violate the Establishment Clause. We will affirm.

I. BACKGROUND

Because we are reviewing the District Court's Rule 12(c) judgment on the pleadings, we view the facts and inferences to be drawn from the pleadings in a light most favorable to C.H., the non-moving party. Janney Montgomery Scott, Inc. v. Shepard Niles Inc., 11 F.3d 399, 406 (3d Cir. 1993). The following facts are affirmatively alleged in the complaint.

This case arises from two incidents that occurred while Z.H. was a student at the Haines Elementary School in Medford, New Jersey. The first incident occurred while Z.H. was a kindergarten student. In the spirit of the Thanksgiving holiday, Z.H.'s teacher asked the students to make posters depicting what they were "thankful for." Z.H. produced a poster indicating that he was thankful for Jesus. Initially, Z.H.'s poster was hung in the hallway outside the kindergarten classroom along with all of the other students' artistic works. Subsequently, on a day when Z.H.'s teacher was absent from school, certain unnamed employees of the Defendant Township of Medford Board of Education removed Z.H.'s poster because of its religious theme. When Z.H.'s teacher returned the next day, she placed the poster back on the hallway wall, but hung it in a less prominent location at the end of the hallway.

3

The second incident occurred approximately one and one-half years later while Z.H. was a student in defendant Grace Oliva's first grade class at Haines Elementary School. As a reward for special achievement in reading assignments, Ms. Oliva invited students to bring to class a book from home and read one of their favorite stories to the class. The only pre-announced condition to this privilege was that Ms. Oliva would review the stories proposed by the students to insure that their length and complexity were appropriate for first graders. Z.H. qualified for this honor and brought to school his favorite book, entitled"The Beginner's Bible: Timeless Children's Stories," which was a cartoon-illustrated collection of 95 children's stories based upon The Bible. Z.H. asked to read "A Big Family," a story based upon Genesis 29:1-33:20 that read, in its entirety, as follows:

> Jacob traveled far away to his uncle's house. He worked for his uncle taking care of sheep. While he was there, Jacob got married. He had twelve sons. Jacob's big family lived on his uncle's land for many years. But Jacob wanted to go back home. One day, Jacob packed up all his animals and his family and everything he had. They traveled all the way back home to where Esau lived. Now Jacob was afraid that Esau might still be angry at him. So he sent presents to Esau. He sent servants who said, "Please don't be angry anymore." But Esau wasn't angry. He ran to Jacob. He hugged and kissed him. He was happy to see his brother again.

After reviewing Z.H.'s selection, Ms. Oliva informed Z.H. that he could not read this story to the class "because of its religious content." Instead, Ms. Oliva permitted Z.H. to read the story to her outside the presence of the other students. Other students who brought in stories from non-religious sources were permitted to read their stories to the class.

Upon learning of her son's experience, C.H. contacted several school officials. First, C.H. contacted Ms. Oliva who informed her that Z.H. could not read "the Bible" in class "because it might influence other students." Next, C.H. contacted defendant Gail Pratt, Principal of Haines Elementary School, who explained that Z.H.'s reading

4

selection "was the equivalent of praying and might upset Muslim, Hindu and Jewish students." Further, Pratt noted that there was "no place in the public school for the reading of the Bible" and that perhaps C.H. should consider removing Z.H. from public school. C.H. then contacted defendants Patrick Johnson, Superintendent of Schools, and the Medford Board of Education, demanding that Z.H. be allowed to read his story to the class and that the defendants apologize for their conduct. These defendants did not respond to this demand.

For apparently unrelated reasons, Z.H.'s family subsequently moved from the Medford school district. At the time the complaint was filed, Z.H. was attending public school in another community also in Burlington County, New Jersey.

C.H. filed a two-count complaint in the District Court, alleging that the defendants' actions violated Z.H.'s First Amendment right to freedom of expression. While her complaint did not allege that the defendants' actions violated the Establishment Clause, that claim was thereafter raised and the District Court's opinion addressed it. C.H. appeals the disposition of that claim, and we will consider it as well. Named as defendants were Oliva, Pratt, Johnson, the Medford School Board, Leo Klagholtz, New Jersey's Commissioner of Education, and the New Jersey Department of Education. In Count I, plaintiff sought monetary damages against the Medford defendants alleging that they intentionally, willfully or with reckless disregard, deprived Z.H. of his constitutionally protected right to freedom of expression in violation of 42 U.S.C.S 1983. In Count II, plaintiff alleged that the state defendants aided in the violation of Z.H.'s First Amendment rights, and sought an order requiring them to implement the policies necessary to protect from discrimination any student who presents religious views.

The defendants moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). The District Court granted defendants' motion and dismissed the complaint against all defendants.1 C.H. now appeals. We have jurisdiction under

_____

1. The District Court's opinion also addressed a number of the defendants' jurisdictional defenses. See C.H. v. Oliva, 990 F. Supp. 341,

28 U.S.C. S 1291, and exercise plenary review over district court dismissals under Rule 12(c). Hayes v. Community Gen. Osteopathic Hosp., 940 F.2d 54, 56 (3d Cir. 1991); Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988).

II. "A BIG FAMILY"

A.

While the parties dispute some details, they agree that (1) "A Big Family" was an appropriate response to the assignment given by Ms. Oliva to her first-grade class in the sense that it was a favorite story of Z.H.'s and was of appropriate length and reading complexity, and (2) Z.H. was permitted to read "A Big Family" only to his teacher and not to his classmates in class because it was a story based upon the Bible. Accordingly, the issue presented by the undisputed facts can be simply stated: whether public school students in the first grade have a First Amendment right to present religious material in class where that material is responsive to a teacher's assignment.

Plaintiff correctly points out that state policies that restrict expression of religious perspectives are not viewpoint neutral even where those policies apply equally to all religious perspectives. While such policies do not discriminate against any particular religious faith, they do discriminate against non-secular perspectives. See Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 831 (1995); Lamb's Chapel v. Center Moriches Sch. Dist., 508 U.S. 384, 393-94 (1993). As a result, plaintiff insists such restrictions are precluded by the First Amendment where, as here, they are not narrowly tailored to serve a compelling state interest.

The defendants respond that, in the context of afirst-grade classroom, a teacher must be able to take cognizance
_____

347-52 (D. N.J. 1996). In so doing, the District Court dismissed the State Department of Education as a defendant on Eleventh Amendment grounds and removed C.H. as a plaintiff in her personal capacity because she lacked standing. Id. at 348-49.

6

of the fact that state-compelled exposure of young children to religious material is a matter of great sensitivity among members of a school community. Defendants insist that students of this age are very impressionable and cannot be relied upon to distinguish between those things their teacher endorses and those things she merely allows to be expressed in her classroom. Accordingly, the defendants urge that the situation confronted by Ms. Oliva held a realistic and substantial risk of the school's being perceived by the students and their parents as endorsing the Bible before a captive and vulnerable audience. They conclude that teachers must be permitted to avoid subject matter holding this kind of potential for disruptive controversy.

B.

Although it is undisputed that public school students " `do not shed their constitutional rights . . . at the schoolhouse gate,' the nature of those rights is[determined by] what is appropriate for children in school." Veronica Sch. Dist. 47J v. Acton, 515 U.S. 646, 655-56 (1995) (quoting Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503, 506 (1969)). "The State's power over school children . . . is custodial and tutelary, permitting a degree of supervision and control that cannot be exercised over free adults." Id. at 655. Moreover, it is well accepted that public schools perform a critical role in shaping the nation's youth, and that federal courts should be wary of interfering in this process. As the Supreme Court observed more than thirty years ago:

> Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.

Epperson v. Arkansas, 393 U.S. 97, 104 (1968). Over the years, the Court has repeatedly reemphasized this theme. E.g., Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988).

With this foundation, we turn to the Supreme Court precedent most helpful in the current context, Hazelwood

Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988). In Hazelwood, the Supreme Court considered whether a public school's decision to excise two articles from the student paper violated the students' First Amendment rights. The newspaper, Spectrum, was written and edited by the high school's Journalism II class, under the direction of the teacher, and was published and printed with funds supplied by the high school. Prior to the final press run of the school year, the teacher reviewed the year'sfinal edition and objected to two stories that were scheduled to be included. One of the stories described the experiences of three of the school's students with pregnancy, the other discussed the impact of divorce on students at the school, and both were written in a manner that might have revealed the identity of at least some of the students and parents discussed. Because he believed there was insufficient time before the scheduled press run to modify the stories, the teacher elected to pull the stories from the press run with the approval of his superiors.

The Supreme Court first addressed the issue of whether Spectrum could appropriately be characterized as a public forum. The Court found that the school had never evinced an "intent to open the pages of Spectrum to `indiscriminate use' by its student[s]," and, on the contrary, had "reserve[d] the forum for its intended purpos[e] as a supervised learning experience for journalism students." Hazelwood, 484 U.S. at 270 (internal citations and quotation marks omitted). For these reasons, Spectrum was found to be a non-public forum. This meant that the school was entitled to exercise control over the content of the paper for purposes other than maintaining discipline and avoiding disruption of the learning process.

The Hazelwood Court then explained that there was an important additional distinction between speech that may be perceived as promoted by a school and speech that a school is asked only to tolerate:

> The question whether the First Amendment requires a school to tolerate particular student speech . . . is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question

addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

Hazelwood, 484 U.S. at 270-71.

Hazelwood teaches that student expression that is a part of a school curriculum may be subject to greater restrictions than tolerated speech and articulates the relevant legal standard to be applied in cases involving such expression:

Educators are entitled to exercise greater control over this . . . form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. . . . [E]ducators do not offend the First Amendment by exercising . . . control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

Id. at 271-73 (emphasis added).

The Court gave the following examples of the kinds of restrictions that would be considered "reasonably related to legitimate pedagogical concerns":

[A] school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on

9

potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting. A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with "the shared values of a civilized social order," or to associate the school with any position other than neutrality on matters of political controversy.

Id. at 272 (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683 (1986)).

It is apparent from these examples that a viewpoint-based restriction on student speech in the classroom may be reasonably related to legitimate pedagogical concerns and thus permissible. A rule foreclosing classroom speech that promotes the use of alcohol or that advocates a position on a controversial political issue is recognized by Hazelwood to be permissible even though it is not viewpoint neutral.

After thus explicating the "legitimate pedagogical concerns" standard, the Hazelwood Court turned to the case before it and conducted a contextual analysis that took into account the sensitive nature of the subject matter of the excised articles and the ages of the intended audience, as well as the privacy interests of the students and parents that might have been identified. The ultimate conclusion was that the First Amendment rights of the student journalists had not been violated. In the course of reaching this conclusion, the Court rejected the argument that school officials should be permitted to exercise prepublication control over school-sponsored student expression only pursuant to preestablished criteria. It believed that preestablished "regulations in the context of a curricular activity could unduly constrain the ability of educators to educate." Hazelwood, 484 U.S. at 273 n.6

Hazelwood clearly stands for the proposition that educators may impose non-viewpoint neutral restrictions on the content of student speech in school-sponsored

10

expressive activities so long as those restrictions are reasonably related to legitimate pedagogical concerns. Contrary to plaintiff 's suggestion, this remains the law of the land.

Plaintiff insists that under Lamb's Chapel v. Center Moriches Sch. Dist., 508 U.S. 385 (1993), and Rosenberger v. Rector, 515 U.S. 819 (1995), absent a compelling state interest, it is no longer permissible under any circumstances for a school to prohibit religious perspectives while permitting secular ones. Lamb's Chapel and Rosenberger are distinguishable from Hazelwood, however. The student speech at issue in both Rosenberger and Lamb's Chapel is more appropriately characterized as "tolerated," rather than "promoted," speech. Indeed, Rosenberger expressly distinguished and preserved Hazelwood on this ground.

In Lamb's Chapel, a public school restricted speech by permitting numerous community organizations to access its facility for after-hours use, while denying a church organization access when it sought to use the facilities to show a film series on family and child-rearing issues from a Christian perspective. In Rosenberger, the University restricted student speech by refusing to grant funding from a student activities fund for extracurricular activities to a student-run publication with an explicitly Christian perspective, even though such funding was granted to other student organizations. In neither case did the expressive activity at issue "occur in a traditional classroom setting, . . . supervised by faculty members and designed to impart particular knowledge or skills to students," as in Hazelwood. Hazelwood, 484 U.S. at 570. Moreover, Rosenberger distinguished Hazelwood on the ground that the latter dealt with the State's ability to impose restrictions on the school's own speech, whereas Rosenberger addressed state restrictions on private, or tolerated, speech:

> [W]hen the [State] determines the content of the education it provides, it is the [State] speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker . . . . It does not follow, however, . . . that viewpoint-based restrictions are proper when the [State] does not

11

> itself speak or subsidize transmittal of a message it
> favors . . . . A holding that the [State] may not
> discriminate based on the viewpoint of private persons
> whose speech it facilitates does not restrict the[State's]
> own speech, which is controlled by different principles.
> See, e.g., Board of Ed. of Westside Community Schools
> (Dist. 66) v. Mergens, 496 U.S. 226, 250 (1990);
> Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260,
> 270-72 (1988).

Rosenberger, 515 U.S. at 833-34.

Thus, the requirement of viewpoint neutrality, while
essential to the analysis of a school's restrictions on extra-
curricular speech, such as that at issue in Rosenberger and
Lamb's Chapel, is simply not applicable to restrictions on
the State's own speech. Under Hazelwood, "[e]ducators are
entitled to exercise greater control over . . . student
expression" when it is elicited as part of a teacher-
supervised, school-sponsored activity. Hazelwood , 484 U.S.
at 271. In that specific environment, viewpoint neutrality is
neither necessary nor appropriate, as the school is there
responsible for "determin[ing] the content of the education
it provides." Rosenberger, 515 U.S. at 833.2

_____

2. This conclusion is not inconsistent with Chandler v. James, No. 97-
6898, 1999 WL 493495 (11th Cir. July 13, 1999). In Chandler, the Court
held that the students' First Amendment right to freedom of expression
was violated where students were barred from engaging in purely
student-initiated, unsupervised, religious expression at school, such as
prayer or other devotional speech at school-related assemblies, sporting
events, or graduation ceremonies. The Chandler Court focused on the
fact that the student speech at issue was purely student-initiated, and
found that "the speech is not the State's--either by attribution or by
adoption." Id. at *6. Unlike Z.H.'s speech here, the student speech at
issue in Chandler was clearly "tolerated" speech, triggering a higher
level
of scrutiny of the restrictions involved. Indeed, the Court's conclusion
that the limitation was unconstitutional was expressly predicated on this
fact, thereby distinguishing it from the case at bar. See id. at *10 ("So
long as school personnel do not participate in or actively supervise
student-initiated speech, [the County School Board] cannot
constitutionally prohibit students from speaking religiously. . . .").

C.

We have no difficulty concluding that Ms. Oliva'sfirst-grade classroom was a non-public forum. There is no claim that the school invited the public, or any segment of the public, to use this forum for expressive activity. To the contrary, it was operated by the school exclusively for purposes of elementary education. While expressive activity was encouraged in this classroom, such expression was encouraged in the context of a "supervised learning experience." Id. at 270. In this respect, the forum at issue here is analogous to that in Hazelwood, in which a school-sponsored, student-run newspaper was held to be a nonpublic forum largely because the school retained control over the paper to ensure it was reserved "for its intended [educational] purpose." Id.; see also Muller v. Jefferson Lighthouse Sch., 98 F.3d 1530, 1540 (7th Cir. 1996) (elementary school classroom was a nonpublic forum); Duran v. Nitsche, 780 F. Supp. 1048 (E.D. Pa. 1991) (same).

We also have no difficulty concluding that Z.H.'s proposed story, like Spectrum, was a part of the school's curriculum and is appropriately characterized as promoted expression. It necessarily follows that the issue for decision is whether the decision to deny permission to read"A Big Family" to the class was reasonably related to a legitimate pedagogical concern. We conclude that it was.

D.

We note at the outset that the decision maker here was the classroom teacher, Ms. Oliva. She was vested with the authority, unconstrained by school regulations, to determine the manner in which the classes should be conducted so as to best serve the educational mission of the school. This required her to exercise her discretion in light of all the circumstances she confronted. Her exercise of this discretion is entitled to substantial deference from this Court not only because she is a professional educator, but also because she is in a far better position than we to predict how students and their parents are likely to respond to the way she conducts her class in any given situation and what impact those responses may have on the ongoing educational process.

13

Z.H. wanted to read a story from "The Beginner's Bible."
If he were permitted to do so, it was reasonable to expect
that other students might recognize that presentation as a
story from the Bible. Even if Z.H. did not choose to
expressly so inform his classmates, the title of the volume,
the names of the characters and the clothing in which the
characters were depicted in the illustrations could convey
this message. To be sure, as plaintiff stresses, the content
of the story was consistent with its being from a secular
source. But the potential for Z.H.'s presentation being
perceived by some of his classmates as a reading from the
Bible clearly existed, and we believe a teacher in Ms. Oliva's
position was entitled to take that fact into account.

In determining whether Ms. Oliva's decision was
reasonably related to legitimate pedagogical concerns, the
context is, of course, crucial. Ms. Oliva's was a first-grade
class. For children at this level, their teacher is a primary
source of authority in their lives. They look to their teacher
for signals of appropriate behavior. As a result, lessons that
a first-grade teacher imparts to a class, or allows to be
imparted in a classroom under her supervision, are likely to
be understood as carrying her imprimatur. While older
students may be able to distinguish messages a teacher
specifically advocates from those she merely allows to be
expressed in the classroom, most first graders cannot be
counted on to make this nuanced distinction.

We believe it was also an important part of the context of
Ms. Oliva's decision that the classroom setting involved a
religiously heterogeneous and captive audience. It is not
unreasonable to expect that parents of non-Christian
children would resent exposure of their six-year-old
children to a reading from the Bible. Nor is it unreasonable
to expect that some parents of Christian first graders would
regard a compelled classroom exposure to material from the
Bible as an infringement of their parental right to guide the
religious development of their children at this stage.
Moreover, it is not unreasonable to expect that any
resentment engendered by Z.H.'s reading would have a
significant adverse impact on the important relationship
between the parents, the teacher, and their school.

14

It is most certainly true, as plaintiff emphasizes, that religion is an important part of the human experience and that no child's education can reasonably be regarded as complete without meaningful exposure to the variety of religious perspectives that he or she will encounter in the community and to the impact that religion has had in the development of civilization. For this reason, there are undoubtedly some contexts in which a school's foreclosure of student religious expression in a classroom will not be reasonably related to a legitimate pedagogical concern. The pedagogical issue presented by this case, however, is one of timing. Our holding is a narrow one: a first-grade public-school teacher may reasonably conclude that the pedagogical detriment likely to flow from permitting what may be perceived as a reading of a Bible story in her classroom outweighs any pedagogical benefits.

III. THE POSTER

We now turn to the school's decision to temporarily remove Z.H.'s poster from the kindergarten arts display. Our analysis and conclusion parallel those of the preceding section. First, we conclude that the display area in the hall outside the kindergarten classroom, like the first-grade classroom, was a non-public forum. Nothing in the record suggests that it had been opened up to the display of any material not constituting, or generated in response to, the school's educational curriculum. Moreover, we also conclude that the art display, like the stories read in class, was "promoted" rather than "tolerated" speech. It follows that the issue to be resolved is whether the school's decision to temporarily remove Z.H.'s poster was reasonably related to a legitimate pedagogical concern.

Z.H.'s kindergarten teacher accepted his poster as responsive to the assignment--that he depict something for which he was thankful. She placed it in the hall with the posters of his classmates. During the teacher's absence from school, Z.H.'s poster was taken down because of concern over its religious content. It was restored to the display, however, by his teacher on her return. Given the sensitivity of the issues raised by student religious expression, coupled with the notable immaturity of the

15

students involved and the relatively public display of the posters in the school hallway, the school's temporary removal of the poster does not violate the First Amendment rights of the student artist. As we have indicated, decisions on issues of this kind necessarily involve fact-sensitive exercises of discretion by school authorities and reservation of a brief period for deliberation is thus a measure reasonably related to legitimate pedagogical concerns. Cf. Muller v. Jefferson Lighthouse School, 98 F.3d 1530, 1541 (7th Cir. 1996) (failure of school regulations to provide a definite time limit within which decisions to grant or deny permission to engage in expressive activity was reasonable); Salinas v. Sch. Dist. of Kansas City, 751 F.2d 288 (8th Cir. 1984) (delay occasioned by school board's deliberations over sensitive requests for use of facilities for expressive activity did not violate the requester's First Amendment rights).3

IV.

Plaintiff additionally asserts that defendants violated the Establishment Clause. The District Court analyzed this claim under Lemon v. Kurtzman, 403 U.S. 602 (1971), and found no violation. On appeal to this Court, plaintiff insists that by welcoming favorite stories, but excluding those that the teacher deemed "religious," defendants exhibited a "hostility toward religion" that is barred by the Establishment Clause. In addition, plaintiff argues that by

_____

3. In her complaint, plaintiff alleges that the poster was removed "because of its religious theme." App. at 7. She further alleges that Z.H.'s teacher "properly returned the poster to the hallway, although this time the poster was placed at a less prominent location at the end of said hallway." Id. Plaintiff 's complaint does not, however, accuse Z.H.'s teacher of having placed the poster in a less prominent location because of its religious content. Nevertheless, plaintiff argues before us that the placement of the poster on its return constituted an independent violation of Z.H.'s First Amendment rights. We decline plaintiff 's invitation to require the District Court to review and regulate the school's placement of its students' artwork. Even if the sensitivity of the subject matter on Z.H.'s poster played some role in its placement, we believe that placement would be within the permissible discretion of Z.H.'s teacher for essentially the same reasons we have given in sustaining Ms. Oliva's exercise of her discretion.

16

involving the teacher in the determination as to which stories are too religious to be read to the class, the defendants' conduct "entangles government with religion, and departs from the neutrality toward religion that the Establishment Clause mandates."

The plaintiff misconstrues the requirements of the Establishment Clause. To determine whether the defendants' conduct violated the Establishment Clause, we continue to apply the three-part test set out in Lemon. See ACLU of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1483 (3d Cir. 1996) (en banc). Briefly stated, a government practice does not offend the Establishment Clause if (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create an excessive entanglement of government with religion. Lemon, 403 U.S. at 612-613. We agree with the District Court that this test is satisfied here.

First, the defendants' purpose in restricting Z.H.'s reading to Ms. Oliva alone was, as discussed at length above, distinctly secular. Ms. Oliva chose to restrict Z.H.'s reading as a means to ensuring that no student mistakenly believe that Z.H.'s religious beliefs were officially sanctioned by the school. This concern for the possibility of confusion, as well as the possibility that Z.H.'s story might "upset" other students, was motivated by distinctly educational considerations. There is no suggestion to the contrary. Second, the one-time restriction Ms. Oliva imposed cannot be said to have had "the effect of communicating a message of government endorsement or disapproval of religion," Lynch v. Donnelly, 465 U.S. 668, 692 (1984), let alone the "hostility toward religion" which plaintiff alleges. Ms. Oliva's restriction was an appropriate compromise, well-justified by her pedagogical concerns. Rather than require Z.H. to pick "another" favorite story, her compromise respected the integrity of his choice and permitted him to read his chosen tale in reward for his achievements. The accommodating approach Ms. Oliva took was thus far from hostile or disapproving. Finally, Ms. Oliva's conduct in this regard did little to entangle the government with religion. To the contrary, by implementing an alternative course that would

17

not entail her incorporation of his reading into that day's classwork, or her "approval" of Z.H.'s performance before the class, Ms. Oliva deftly avoided any appearance of entanglement that might have resulted. Compare Chandler, 1999 WL 493495, at *8 ("Teacher participation in student-initiated prayer improperly entangles the State in religion and signals an unconstitutional endorsement of religion." (internal citation omitted)).

As the Supreme Court has explained, "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of `neutrality' toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents." Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 696 (1994) (internal citations omitted). We think defendants appropriately steered such a neutral course in this case. Thus we agree with the District Court that, even viewing the facts in the light most favorable to the plaintiff, C.H. has failed to state a violation of the Establishment Clause.

V.

In sum, we conclude that plaintiff has failed to allege a violation of Z.H.'s First Amendment right to freedom of expression because the defendants' restrictions on Z.H.'s speech were reasonably related to a legitimate pedagogical concern. In addition, we find no violation of the Establishment Clause. Finally, because we have found no constitutional violation, plaintiff is not entitled to injunctive relief.

Accordingly, we will affirm the order of the District Court granting defendants' judgment on the pleadings under Rule 12(c).

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

18