**BOARD OF TRUSTEES, ANCHORAGE POLICE AND FIRE RETIREMENT SYSTEM, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

**Municipality of Anchorage, Appellant,**

v.

**Board of Trustees, Anchorage Police and Fire Retirement System, Appellee.**

**Nos. S–11893, S–11922.**

Supreme Court of Alaska.

Sept. 29, 2006.

---

Douglas J. Serdahely, Patton Boggs LLP, Anchorage, and Robert D. Klausner, Klausner & Kaufman, P.A., Plantation, Florida, for Appellant and Appellee Board of Trustees.

James D. Gilmore, Gilmore and Doherty, P.C., Anchorage, for Appellee and Appellant Municipality of Anchorage.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

In these consolidated appeals, we address the question whether the Municipality of Anchorage is required to compensate the Anchorage Police and Fire Retirement System ("APFRS System" or "System") for any resulting adverse actuarial impact on the System when the Municipality of Anchorage settles a grievance. Under different factual scenarios, this question was litigated before two different superior court judges, with each reaching a different result. One superior court judge determined that chapter 3.85 of the Anchorage Municipal Code contemplates absorption by the System of the impact of grievances. Therefore, any resulting actuarial liability from grievances is not an unconstitutional change to the Retirement Plan, and the Municipality does not have to compensate the System for the impact. The other superior court judge determined that requiring the System to absorb the impact of the actuarial liability violates article XII, section 7 of the Alaska Constitution. Because we believe that under the language of chapter 3.85 and the policies adopted by the Board of Trustees of the System, the impact of the grievances does not implicate article XII, section 7 of the Alaska Constitution, we conclude that, under the facts of the cases before us, the Municipality of Anchorage is not required to compensate the System for the actuarial impact of the settlement of the grievances.

## II. FACTS AND PROCEEDINGS

### A. The APFRS System

The Municipality of Anchorage has maintained a defined benefit retirement system since 1968 called the Anchorage Police and Fire Retirement System, which was created to provide disability, retirement, and death benefits to the Municipality's police and fire department employees.[1] There are three distinct plans within APFRS, and members belong to either Plan I, II, or III, depending on their date of hire.

---

1. *Municipality of Anchorage v. Gallion,* 944 P.2d 436, 437–38 (Alaska 1997) (*Gallion I*).

By the 1990s, Plans I and II had accumulated surplus assets, and a lawsuit, hereinafter referred to as *Gallion II*,[2] was filed by members of Plans I and II claiming the right to the surplus assets. The parties entered into a conditional settlement agreement, whereby it was agreed that "[a]ll beneficial, residual and reversionary interests in the trust assets, including any surpluses, belong to the members" and not to the Municipality. It was further agreed that the System's Board of Trustees (Board) would recommend to the Anchorage Assembly that it repeal the existing Plan under chapter 3.85 and adopt a new ordinance and Plan. Under the conditional settlement agreement,[3] a distribution plan for the existing surplus assets was made. It was further recommended that a sixteen percent contingency be set aside to protect from market and actuarial fluctuations. With regard to future surplus assets in excess of the sixteen percent contingency, the agreement provided that

> 75% may be used for future benefit enhancements and the remaining 25% of such surplus shall be retained as a separate contingency reserve. Any such benefit enhancements must be approved by a simple majority of the new Board[.]

A *Notice of Proposed Settlement* was sent to all members of Plans I, II, and III, which outlined the terms of the proposed settlement and noted that the settlement "provides for the possibility of additional future benefit increases. Subject to conditions set forth by the Ordinance, future surpluses above the 16% contingency reserve (plus an additional contingency reserve to be established from future surpluses) may be used for future benefit increases without further Assembly approval." The Municipality adopted the recommendations set forth in the conditional settlement agreement and revised chapter 3.85. Relevant portions of revised chapter 3.85 are set forth below. The revisions of significance to this appeal are summarized below:

*System Purpose*

Anchorage Municipal Code 3.85.010 sets forth the purpose of the revised Plan, stating in relevant part that "[a]ll rights under the prior plan are carried forward without interruption. This system is intended to be a contractual relationship in accordance with the provisions of Article XII, Section 7, of the Constitution of Alaska."

*Relevant Definitions*

Anchorage Municipal Code 3.85.015 contains a number of definitions, including AMC 3.85.015(F), which defines average monthly compensation for Plan I and II members as

> compensation paid by the Municipality during the period of the three consecutive calendar years which yielded the highest income divided by the number of months for which such compensation was received. This can also be calculated by utilizing the two full calendar years preceding retirement, plus at least the month of January of the third and final year if that produces a higher monthly average.

Under AMC 3.85.015(L), compensation for Plan I and Plan II members is defined to include overtime, but overtime is not included as compensation for Plan III members. Anchorage Municipal Code 3.85.015(U) defines an enhanced benefit as "a benefit created from time to time from available surplus assets." Under AMC 3.85.015(OOO), vested benefit means "an immediate or deferred benefit to which a member has gained a nonforfeitable right under the provisions of [chapter 3.85]."

*Authority of the Board of Trustees*

Under AMC 3.85.020(A), the sole and exclusive administration of the retirement system is vested in the Board of Trustees and "[t]he board shall administer the system as set forth in this chapter and shall be the final authority in all matters pertaining to the

---

**2.** *Gallion v. Anchorage Police & Fire Ret. Sys. and Municipality of Anchorage*, Superior Court No. 3AN–98–04563 Civil.

**3.** The conditional settlement also resulted in settlement of *Gallion I*, discussed more fully below, and two separate lawsuits, *Woolsey v. Municipality of Anchorage*, Superior Court No. 3AN–93–05222 Civil, and *Mower v. Municipality of Anchorage*, Superior Court No. 3AN–97–07364 Civil.

application, interpretation and administration of the provisions of [chapter 3.85]."

Under AMC 3.85.020(G), the Board has the authority to take such action as it deems necessary to carry out the provisions of the chapter. "All decisions of the board of trustees made in good faith shall be final, binding and conclusive on all parties, consistent with the provisions of [chapter 3.85]."

### Retroactive Compensation

Retirement benefits for members of Plans I and II are calculated at the rate of 2.5% of average monthly compensation multiplied by the years of credited service under AMC 3.85.065. "Retroactive compensation ... shall be considered by the board in the calculation of benefits if paid as a result of a grievance, arbitration award, collective bargaining agreement or court ordered judgment or settlement. However, any amounts awarded or paid as court costs, interest, attorney's fees, statutory penalties, punitive damages and any other type[s] of retroactive compensation that does not meet the definition of compensation ... shall be specifically excluded."

Under AMC 3.85.050(C), "[a]ctive members may elect to have retroactive pay treated as compensation in the year in which paid or to have retroactive pay allocated to the pay periods where it would have been actually paid."

### Required Contributions of the Municipality

Anchorage Municipal Code 3.85.055(A) provides that "[n]otwithstanding the provisions of subparagraph 'E' below, the municipality shall make contributions on an actuarially determined basis generally on a municipality/member ratio of 2.5 to 1." Subparagraph E provides that "[t]he municipality, in addition to the payroll deductions of members, shall contribute additional monies to the system in an amount to ensure that the system is at all times financially sound."

Anchorage Municipal Code 3.85.055(J) provides, "[a]s of the effective date of this chapter, Plans I and II are in a surplus funded status. Resumption of contributions to Plans I and II shall not be required unless, as determined and required by the actuary for the system, the funded status of the plan falls below 100 percent funding; nor shall contributions be continued after 100 percent funding is again achieved."

### Reserve Funding and Enhanced Benefits

The Board is required under AMC 3.85.155 to maintain a contingency reserve at all times for funding of the minimum defined benefits at not less than sixteen percent of accrued and projected future liabilities. Surplus assets are reserved for the exclusive benefit of the members and beneficiaries of the System and surpluses belong to the members under 3.85.155(B).

Under AMC 3.85.155(D), if the Plan has 116% funding, the Board has the authority to approve the payment of enhanced benefits from the surplus assets with a value not to exceed seventy-five percent of the available surplus assets, with the remaining twenty-five percent held as additional reserve funding. Anchorage Municipal Code 3.85.155(D) further provides that "[t]he form of any enhancement shall be determined in the sole discretion of the board."

Anchorage Municipal Code 3.85.155(G) states that "[n]o member or beneficiary shall have a contractual right as to the timing of a distribution of enhanced benefits authorized by the board nor to receive a particular form of enhancement benefit, except as provided in this section." And AMC 3.85.155(H) provides that "[a]ll enhanced benefits shall be funded solely from surplus assets and shall not be the actuarial or financial responsibility of the municipality."

On December 7, 2000, the Board adopted a new "Policy 2000–4" to establish the Board's policy with regard to the application of retroactive compensation payments to members of the System following the reestablishment of the Plan. Under Policy 2000–4, retroactive compensation is again defined in relevant part as pay "resulting from grievances, arbitration awards, collective bargaining agreements, or court ordered judgments, but excluding any amounts awarded or paid for court costs, interest, attorneys' fees, statutory penalties or punitive damages[.]" While

for retired or deferred vested members retroactive compensation is allocated to the pay periods where it would have actually been earned, active members may either allocate retroactive compensation to a single pay period or allocate it to the periods where it would have been earned. Late payment of overtime is allocated to the pay period where it is paid rather than where it is earned. Policy 2000–4 provides that "[i]f eligible retroactive compensation alters the compensation component of any benefit calculation (such as the need to use different 'high' years or different pay periods), then the benefit will be recalculated to use the higher value."

## B. The Stillman Litigation

Police Officer Gereth Stillman was terminated by the Municipality in September 1998. Through the police union, he filed a grievance, which was denied by the Municipality and was then referred to arbitration. On August 1, 2000, the arbitrator ruled that Stillman be reinstated with back pay and benefits for the two-year period after his termination. The estimated actuarial present value of the difference in Stillman's compensation due to the retroactive compensation was $604,654 as of February 1, 2003.

On August 12, 2003, the Board of Trustees filed a complaint for damages against the Municipality, alleging that it did not allow the Board to participate in discussions regarding Stillman's restitution in a manner that would reduce the award's impact on the System's liabilities.[4] The complaint alleged that recognizing Stillman's award in 2001 created a substantially greater liability to the System than would have been created if the award had been made in 2000. It sought compensation from the Municipality of the $604,654 impact on the System. Both parties filed motions for summary judgment.

On March 11, 2005, Superior Court Judge Dan A. Hensley issued a decision denying the Board's motion for summary judgment and granting the Municipality's motion for summary judgment. Judge Hensley noted that the adverse employment action that triggered the increased actuarial liability was not directed at the pension plan. Judge Hensley further reasoned that the increased actuarial risk was only incidental to that action and that the pension plan recognized that employment litigation might occasionally result in increased actuarial liability. Therefore, he concluded that the risk of increased liability is an inherent part of the System, that the Municipality's settling of the grievance was not an unconstitutional change to the Plan, and that the Municipality did not have to compensate the System for that liability. The Board filed a motion for reconsideration, which was denied on March 21, 2005. The Board appeals.

## C. The 4–10 Litigation

In 1994 the Municipality changed the work schedule of patrol officers from four 10–hour shifts per week to five 8–hour shifts per week. This resulted in a grievance known as the 4–10 grievance or litigation. An arbitrator determined in 1998 that the Municipality violated its collective bargaining agreement by unilaterally changing the work week of patrol officers without first bargaining with the Anchorage Police Department Employees Association. This decision was appealed. Although the 4–10 grievance was still pending when the conditional settlement agreement was reached, and the settlement agreement resolved other disputes, there was no resolution of the 4–10 litigation in the conditional settlement agreement.

In early 2001, during the pendency of the appeal, the Municipality reached a settlement with the Anchorage Police Department Employees Association by which the Municipality agreed to pay back wages in the form of overtime to certain police officers in the amount of approximately $4 million. The Board was not a party to the 4–10 litigation. Because overtime is included within the definition of compensation for members of Plans I and II, the $4 million paid to the police officers to settle the 4–10 litigation was factored into their compensation and therefore into their calculation of benefits. This resulted in an increased cost and projected liability to the System. The actuarial impact on the System of the 4–10 litigation was $577,406.

4. Superior Court No. 3AN–03–10273 Civil.

On April 3, 2002, the Board demanded by letter that the Municipality pay the impact of the 4–10 liability. The Municipality did not respond in writing. On February 18, 2003, the Board filed a complaint against the Municipality, seeking compensation from the Municipality for the $577,406 liability resulting from the settlement.[5] It relied upon AMC 3.85.055(E), which states that the Municipality "shall contribute additional monies to the system in an amount to ensure that the system is at all times financially sound."

A non-jury trial was held on January 5 and 6, 2005. On March 9, 2005, Superior Court Judge Morgan Christen issued findings of fact and conclusions of law, determining that "requiring the System to absorb the cost of the actuarial impact of the 4–10 liability violates Article XII, Section 7 of the Alaska Constitution." Judge Christen reasoned that "[t]he 4–10 impact on the System was not merely a delay in projected compensation; it was an unanticipated increase in total compensation paid to a subset of officers due to the [Municipality's] unforeseeable breach of the collective bargaining agreement." Judge Christen distinguished the 4–10 litigation from other factors that could result in the System's funding falling below 100% (such as poor market performance of the System's invested assets) because the 4–10 litigation, unlike the other factors, "was created by the Municipality's wrongful breach of its labor contract." Judge Christen then concluded that the Board's policy "does not require that the System absorb the actuarial impact of retroactive compensation awards that are caused by [the Municipality] breaching a collective bargaining agreement."

Judge Christen determined that requiring the System to absorb the actuarial impact of the 4–10 settlement was unconstitutional because it increases the System's costs and impairs the ability of the System to withstand future contingencies, hastens the day when plan members might have to pay future contributions, and reduces the ability of

members to receive surplus benefits. She also concluded that, for those members of the Plan who were not a part of the 4–10 litigation, payment of the grievance constituted an impact on the system without a corresponding benefit. Finally, Judge Christen noted that payment of $577,406 is more significant in an actuarially funded system than in a pay-as-you-go system because it impacts the ability of the accrued fund assets to generate income. The Municipality appeals.

Because the appeals raise substantially similar legal issues, they have been consolidated.

## III. DISCUSSION

### A. Standard of Review

 Constitutional issues and statutory interpretation present questions of law and they are reviewed de novo.[6] We review grants of summary judgment de novo and will affirm "if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law."[7] We exercise our independent judgment when deciding questions of law and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[8]

### B. Judge Hensley's Decision Comports with Chapter 3.85.

#### 1. Increased actuarial liability from the settlement of grievances is inherent in the system.

Anchorage Municipal Code 3.85.050(B) contemplates the payment of retroactive compensation in the event of a grievance when it states, "[r]etroactive compensation ... shall be considered by the board in the calculation of benefits if paid as a result of a *grievance*, arbitration award, collective bargaining agreement, or court ordered judgment or settlement." (Emphasis added.) Similarly, Policy 2000–4 defines retroactive

---

5. Superior Court No. 3AN–03–04760 Civil.

6. *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1073 (Alaska 2005); *Alaska Legislative Council v. Knowles*, 86 P.3d 891, 893 (Alaska 2004).

7. *Schaub v. K & L Distribs., Inc.*, 115 P.3d 555, 559 (Alaska 2005).

8. *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005).

compensation as pay "resulting from *grievances,* arbitration awards, collective bargaining agreements, or court ordered judgments or settlements." (Emphasis added.) Furthermore, Policy 2000–4 allows the recipient of a grievance award to add the retroactive compensation to any year in which it is earned, and to thereby receive higher benefits at an increased cost to the System.

Judge Hensley noted that the Plan accounted for employment litigation occasionally resulting in increased actuarial liability. Therefore, he concluded that the risk of increased liability is an inherent part of the System, that the Municipality's settlement of the grievance was not an unconstitutional change to the Plan, and that the Municipality did not have to compensate the System for the liability resulting from the settlement of the grievance. Judge Hensley reasoned that the decision to settle a grievance is akin to any employment decision which results in the increase of liabilities to the System, like the decision to authorize overtime and provide pay raises.

■ Seeking reversal, the Board argues:
The result of the Stillman grievance is that Stillman received a substantial sum, backpay award based on a resolution between the [Municipality] and the [Anchorage Police Department Employees Association] concerning Stillman's grievance arbitration proceedings. Because this substantial backpay award appeared in a single year's paycheck, it had the effect of unexpectedly increasing Stillman's compensation. As pension benefits are based on a percentage of compensation, this resulted in the $604,654 increase in the accrued liabilities of Plan II.
The net effect of the Stillman case is that the [Municipality] reached an agreement in a lawsuit with a third party that left the Retirement System with the bill. The assets of the System, reserved for all participants, firefighters, other police officers, widows, widowers, and orphans in Plan II, have been misdirected to pay the Municipality's debt on behalf of Stillman. This is precisely the misallocation of assets and diminution of benefits disapproved by this Court in [*Municipality of Anchorage v. Gallion,* 944 P.2d 436 (Alaska 1997) (*Gallion I* )].

The "result" of the grievance to which the Board objects, though, is a product of its own Policy 2000–4, which allows active members to allocate retroactive compensation to a single pay period and expressly provides that "[i]f eligible retroactive compensation alters the compensation component of any benefit calculation (such as the need to use different 'high' years or different pay periods), then the benefit will be recalculated to use the higher value." Rather than being "misdirected," Stillman's retroactive compensation was calculated just as contemplated by the Plan.

The Board also misapprehends *Gallion I* when it characterizes the net effect of the Stillman grievance as "precisely the misallocation of assets and diminution of benefits disapproved by this Court in *Gallion I."* In *Gallion I,* we considered the constitutionality of an ordinance that would have permitted the Municipality to make payments out of excess funds in Plans I and II to ensure that Plan III was financially sound.[9] We recognized that chapter 3.85 had treated the plans as separate since their inception, with distinct members and benefits.[10] Also, under AMC 3.85.100(G), an independent actuarial evaluation was required every two years for Plans I and II.[11] We determined that "[n]othing about the APFRS before 1994 would have alerted newly enrolled plan members that their contributions might be used prospectively or retrospectively to fund one of the other plans."[12] We also noted that plan members "reasonably could have expected that the product of their contributions would be used for their ultimate benefit. Certainly they could not have expected that any surplus would be used for the benefit of non-

**9.** 944 P.2d at 438.

**10.** *Id.* at 442.

**11.** *Id.*

**12.** *Id.* at 443.

plan members." [13]

The Municipality distinguishes *Gallion I*, arguing that in the present case, members and the Municipality have known from the inception of the Plans that the payment of grievance awards would be treated as compensation, and that contributions would not be required from the Municipality unless the funded status of the system were to fall below 100%. It reasonably notes that *Gallion I* would have been a different case if, from the inception, members of the Plans had been notified that surplus assets in each of their plans would be averaged with the surpluses in other plans to determine whether contributions were necessary.

Judge Hensley's conclusion that the increased liability stemming from the Stillman grievance was inherent in the System is therefore amply supported by the plain language of the Plan and Policy 2000–4, and our holding in *Gallion I* does not dissuade us from affirming. [14]

### 2. That the Board was not a party to the Stillman grievance does not change the result.

The Board was not a party to the Stillman litigation, and therefore contends that it was error for Judge Hensley to reject its argument that it should not be bound to absorb the actuarial impact from the grievance. Relying upon the Seventh Circuit's decision in *United States v. City of Chicago*,[15] the Board argues that the Municipality may not impose obligations on the Board that the Municipality incurred in litigation with Stillman. But as the Municipality notes, *City of Chicago* is distinguishable. In *City of Chicago*, the litigants agreed upon a consent decree to which the board of a pension plan was not a party. The consent decree required the pension plan to accord seniority status to police officers who had been discriminated against. However, the contributions made on behalf of the officers under the consent decree did not equal those required by the plan for full seniority status to be granted.[16] Since statutory language supported the board's position that it was not the policy of the plan to award seniority status under those conditions, the court ordered that the consent decree be modified.[17] Here, the increase in actuarial liability resulting from the Stillman grievance is consistent with, rather than contrary to, the terms of the Plan, and *City of Chicago* therefore offers no support for the Board's argument.

As the Board notes, Alaska courts recognize that parties to litigation may not bind or affect the rights of non-parties.[18] But the Board is essentially only being asked to absorb the actuarial liability that was incurred through normal operation of Policy 2000–4, and not to alter its policy in order to accommodate unrelated liabilities imposed by a third party. As the Municipality argues, the Board in fact agreed to the imposition of the Stillman obligation because the contract between the parties, memorialized at AMC 3.85.050(B), sets forth the procedure for accounting for retroactive compensation in the event of a grievance. Therefore, it was not error for Judge Hensley to reject the Board's argument that it should not have to absorb the liability because it was not a party to the litigation.

### 3. Judge Hensley did not inappropriately substitute his judgment for that of the Board.

Ordinarily this court uses its independent judgment on questions of law unless

13. *Id.*

14. The Board also cites a number of cases from other jurisdictions for the proposition that "Alaska is not alone in determining that the use of retirement assets for the benefit of the plan sponsor is constitutionally impermissible." But these cases are only persuasive if we adopt the Board's characterization of the Municipality's settlement of the Stillman grievance as misdirecting plan assets, which we decline to do.

15. 978 F.2d 325 (7th Cir.1992). The Board also relies upon *United States v. City of Miami*, 195

F.3d 1292 (11th Cir.1999), which is not on point. It speaks only to whether the district court imposed an excessive remedy when it awarded a disproportionate thirty-five retroactive promotions when only two would have been available absent discrimination. *Id.* at 1297–98.

16. *City of Chicago*, 978 F.2d at 327–30.

17. *Id.* at 333–34.

18. *Universal Motors, Inc. v. Neary*, 984 P.2d 515, 518–19 (Alaska 1999).

the "issue[s] involve[ ] agency expertise or the determination of fundamental policy questions on subjects committed to the agency."[19] If the issue involves agency expertise or fundamental policy questions, we review under the reasonable basis standard and defer to the agency if its interpretation is reasonable.[20]

The Board asserts that by virtue of the language of AMC 3.85.020(A), it is "the final authority in all matters pertaining to the application, interpretation and administration of the provisions of [chapter 3.85]." It therefore claims that its decision that additional contributions by the Municipality were necessary in order to ensure that the system was financially sound should have been binding on the Municipality, as AMC 3.85.055(E) provides that "[t]he municipality, in addition to the payroll deductions of members, shall contribute additional monies to the system in an amount to ensure that the system is at all times financially sound." The Board further argues that its determination that the Municipality was required to make an additional contribution was an exercise of its power to determine actuarial standards and should have been accorded deference.

The Municipality counters that, even though the Board is the "sole and exclusive administrator of the System," it cannot unilaterally change the terms of the contract between the Municipality and the System. It contends that, since this is an issue of statutory interpretation, this court should use its independent judgment and not defer to the Board. Interpreting the ordinance and using contract principles, the Municipality maintains that there are no provisions of chapter 3.85 requiring that the Municipality pay for the grievance, and there is no evidence that the expertise of the Board was even used in determining that the Municipality should pay for the impact of the Stillman grievance.

The term "financially sound" is not defined by the statute, and therefore an argument can be made that the Board has been granted the authority to flesh it out. But AMC 3.85.055(J) provides, "[a]s of the effective date of this chapter, Plans I and II are in a surplus funded status. Resumption of contributions to Plans I and II shall not be required unless, as determined and required by the actuary for the system, the funded status of the plan falls below 100 percent funding; nor shall contributions be continued after 100 percent funding is again achieved." Even if we determined that the Board had the discretion to determine when additional payments to the system were required to maintain the System as financially sound, the other provisions of chapter 3.85 demonstrate that the parties understood the System to be financially sound when the System was fully funded and not when all members were receiving enhanced benefits. Even under a deferential standard, then, the Board's interpretation would not be reasonable. We agree with the Municipality that if the parties intended the Municipality to have an express obligation to make payments in support of a given level of surplus, it would have expressly so provided as it did with minimum levels of funding. We also concur that it would be rewriting the ordinance to impose such an obligation in the name of discretion.

**4. The unpredictable costs of litigation do not warrant distinct treatment from actuarially predictable costs.**

The Board asserts that its determination to treat the "unpredictable effects of litigation differently from costs which can be reasonably predicted according to sound actuarial practices is a fundamental policy decision" and that "it seems reasonable that the Municipality should be expected to pay for [the] unpredictable yet very real adverse impact [of litigation] on the Retirement System." It urges us to adopt Judge Christen's conclusion that "the impact of the 4–10 liability can be distinguished from other variables impacting the System's costs because this impact was within the [Municipality's] control. It was created by the Municipality's wrongful breach of its labor contract." The Municipality, on the other hand, argues that retroac-

**19.** *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 277 (Alaska 2003).

**20.** *Id.*

tive compensation should be treated like all other compensation and its unpredictability is irrelevant to its constitutionality.

The plain language of AMC 3.85 and Policy 2000–4 supports Judge Hensley's interpretation that the risk of increased actuarial liability from litigation is inherent in the System. There are express provisions for the calculation of retroactive compensation stemming from grievances, arbitration awards, collective bargaining agreements, or court-ordered judgments, all of which could arise from either a determination that the Municipality was in some way at fault or from a settlement that mooted the issue of fault. The System by its terms therefore does not contemplate treatment of grievances differently when the Municipality is at fault or simply because litigation might be actuarially unpredictable. Additionally, the concerns with fault raised by Judge Christen are mitigated by the exclusion of statutory penalties or punitive damages from the calculation of retroactive compensation under Policy 2000–4.

## C. Requiring the System To Absorb Liability for Grievances Does Not Raise Constitutional Concerns Under Article XII, Section 7.

■ Under article XII, section 7 of the Alaska Constitution:

Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.

Judge Christen ruled that requiring the System to absorb the actuarial impact of the 4–10 grievance was an unconstitutional impairment of accrued benefits in part because it increases the System's costs and impairs the ability of the System to withstand future contingencies, hastens the day when plan members might have to pay future contributions, and reduces the ability of members to receive surplus benefits.

It is undisputed that the System is currently fully funded, and that the impact of

the grievance awards did not result in impairment of benefits to be distributed in the ordinary course. What the grievance awards did do was increase the System's costs and impact the ability of members to receive surplus benefits. In essence, Judge Christen and the Board characterize the actuarial loss resulting from the settlement of grievances as an impact on the System that has the effect of impairing or diminishing the members' rights. But even if the actuarial loss had an impact, it does not follow that this impact constitutes a change to the System or an impairment of vested rights.

### 1. There was no change.

■ We interpret the concept of change broadly when considering whether changes to a benefit plan unconstitutionally diminish or impair accrued benefits. In *Sheffield v. Alaska Public Employees Association, Inc.,* we faced a change to the actuarial tables used to calculate early retirement benefits that resulted in lower monthly benefits than members would have received under the earlier actuarial tables.[21] We made clear that it was the *impact* of any modifications to benefit plans, and not their form, that was dispositive when assessing whether a change was made and if so whether it was constitutionally infirm.[22] We held:

Even though the statutory terms embodying the employees' contracts remained unchanged, the effect on the individual employee is the same as if the statute had previously promised a specific dollar amount in benefits and that amount was reduced through the amendment process. . . . [T]he form of the change should be disregarded in favor of its impact. As stated by the Massachusetts Supreme Judicial Court in interpreting that state's law protecting employees' contractual rights to retirement benefits:

The minimal meaning . . . is that the "contract" is formed when a person becomes a member by entering the employment, and he is entitled to have the level of rights and benefits then in force *preserved in substance in his favor*

---

**21.** 732 P.2d 1083 (Alaska 1987). **22.** *Id.* at 1087–88.

*without any modification downwards.* ... When we speak of the level of rights and benefits protected by [this statute] we mean the *practical effect of the whole complex of provisions* not excluding the [employees' contributions], for an increase in the [rate thereof] is little different from a diminution of the allowance.[23]

But, as Judge Hensley concluded, allowing the System to absorb losses from grievances did not change the basic operations of the System, even though it increased the Plan's actuarial liability. In form, then, it was not a "change" to the System. It was clear, even prior to the 2000 restatement of the System, that grievances could result in retroactive compensation. And this retroactive compensation could have adverse actuarial liability for the System and could impact the availability of assets to withstand future contingencies through plan obligations, declines in investment revenue, and inability to fund any shortfalls. Therefore, it was the routine functioning of the System that resulted in the loss.

### 2. There was no impairment to a vested right.

While it is undisputed that there was an impact on the System, the question is whether the practical effect of the whole complex of provisions impaired a vested right. The language of chapter 3.85 shows that enhanced benefits are not vested rights. Under AMC 3.85.015(OOO), vested benefit means "an immediate or deferred benefit to which a member has gained a non-forfeitable right under the provisions of this chapter." Under AMC 3.85.010, it is specifically stated that "[t]his system is intended to be a contractual relationship in accordance with the provisions of Article XII, Section 7 of the Constitution of Alaska." But with respect to enhanced benefits, AMC 3.85.155(G) provides that "[n]o member or beneficiary shall have a contractual right as to the timing of a distribution of enhanced benefits authorized by the board nor to receive a particular form of

enhancement benefit, except as provided in this section."

Other provisions of chapter 3.85 further support the contingent nature of enhanced benefits. Anchorage Municipal Code 3.85.015(U) defines an enhanced benefit as "a benefit created from time to time from available surplus assets." Under AMC 3.85.155(D), if the Plan has 116% funding, the Board has the authority to approve the payment of enhanced benefits from the surplus assets, but "[t]he form of any enhancement shall be determined in the sole discretion of the board." And AMC 3.85.155(H) provides that "[a]ll enhanced benefits shall be funded solely from surplus assets and shall not be the actuarial or financial responsibility of the municipality." This combined language demonstrates that enhanced benefits are not vested.

The Board argues that "the retirement benefits which Judge Christen correctly protected in this case are the surplus benefits which members of the System bought at the conclusion of the litigation in *Gallion* for $40 million." But as the Municipality responds, what the System "bought" was a contingent right, not a vested right, to receive enhanced benefits if there was a surplus in the System and the Board exercised its discretion to grant one. Through normal operation of the System, there was a reduction in available assets, but this did not impair a vested right because "[n]o member or beneficiary shall have a contractual right as to the timing of a distribution of enhanced benefits authorized by the board nor to receive a particular form of enhancement benefit."

### 3. Payment of the grievance did not constitute an impact on the System without a corresponding benefit for members of the System who were not part of the 4–10 litigation.

In *Hammond v. Hoffbeck*, we held that "the fact that rights in PERS vest on employment does not preclude modifications of the system; that fact does, however, require that any changes in the system that operate

**23.** *Id.* at 1087 (citing *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320, 327 (1973)) (construing Mass. Gen. Laws ch. 32, § 25(5) (amended 1956)) (emphasis added by *Sheffield* court).

to a given employee's disadvantage must be offset by comparable new advantages to that employee." [24] Judge Christen found that for those members of the Plan who were not a part of the 4–10 litigation, payment of the grievance constituted an impact on the System without a corresponding benefit.

The Municipality argues that Judge Christen erred because it was an expectation of the Plan that some contingencies would arise that would result in a detriment with no corresponding benefit to all members, such as a court-ordered judgment for one member. This argument is supported by the remainder of our decision in *Hoffbeck*. There, we weighed the disadvantages of the reduced benefits against any advantages that might have accompanied them, and concluded that, for at least some of the members of PERS prior to the amendments, the disadvantages of the amendments outweighed the benefits.[25] But noting that courts must construe statutory provisions as constitutional where possible, we divided the public employees into three groups, with different results attaching to each group.[26] We noted that the statute was unconstitutional for enrollees hired before the effective date of the legislation who chose not to receive a new benefits package, but not unconstitutional as to the second group, enrollees in the plan prior to the effective date of the amendments who opted to receive the amended benefits.[27] As for the third group, employees who enrolled in PERS after the effective date of the legislation, no constitutional violation was found because "[i]t [was] clear that the changes made in PERS did not unconstitutionally diminish any vested rights of members of the third group." [28]

Here, the members of the System opted into the restated Plan in 2000 with the understanding that retroactive compensation might impact the liabilities of the System and with notice that the right to enhanced benefits was contingent on the availability of surplus assets within the System. Therefore, there was no change.

## IV. CONCLUSION

The System provides that retroactive compensation stemming from the settlement of grievances will be calculated into compensation for the purposes of determining benefits and will therefore result in increased costs to the System. Allowing the System to absorb the impact of grievances therefore does not constitute a change to the Plan or impair a vested right under the Alaska Constitution. We therefore REVERSE the superior court's determination in 3AN–03–04760 Civil that requiring the System to absorb the impact of the liability is unconstitutional, and AFFIRM the superior court's decision in 3AN–03–10273 Civil that the Municipality is not required to absorb the impact.

---

24. 627 P.2d 1052, 1057 (Alaska 1981).

25. *Id.* at 1058.

26. *Id.* at 1059.

